IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Timothy C. Jones,              :

        Plaintiff,             :

    v.                         :    Case No. 2:07-cv-0254

Timothy Brunsman, et al.,      :    MAGISTRATE JUDGE KEMP

        Defendants.            :

                    OPINION AND ORDER

    Plaintiff, Timothy Jones, filed this action under 42 U.S.C.
§1983, alleging that his constitutional rights were violated
while he was a prisoner at the Chillicothe Correctional
Institution in 2005.  More specifically, he asserts that he
suffered an unnecessary and serious injury on March 20, 2005 when
he was ordered to work on the kitchen serving line.  Mr. Jones
had a medical restriction that limited his ability to work in the
prison.  He claims that this restriction was ignored on the day
in question, and that he suffered a neck and back injury (or
aggravated a pre-existing condition) when he tried to lift a
large pan of food.  Although he originally named several CCI
employees as defendants, the only defendant remaining at the
conclusion of the trial was Corrections Officer Scott Limle.

    The parties consented to the plenary jurisdiction of the
Magistrate Judge and waived a jury trial.  The case was tried to
the Court on February 22 and 23, 2010.  Post-trial briefs were
filed on March 12, 2010.  This Opinion and Order represents the
Court's findings of fact, discussion, and conclusions of law as
required by Fed.R.Civ.P. 52(a).

                I.  The Testimony

                A.  Some Background

This case arises out of a series of incidents that occurred in February and March, 2005. At that time, Mr. Jones was serving a sentence in the custody of the Ohio Department of Rehabilitation and Correction after having pleaded guilty to charges of involuntary manslaughter and felonious assault. He was an inmate at the Chillicothe Correctional Institution (CCI) at all relevant times.

When Mr. Jones was admitted to the Ohio corrections system, he was given a medical evaluation. His medical history included three herniated discs in his neck, and prison treatment notes from 2002 through 2004 showed that he periodically complained of neck pain. (Exhibit P9). He fell in September, 2004 as a result of an encounter with a dog in his dormitory. He hit the back of his head as a result of the fall and subsequently reported neck and back pain with radiculopathy. X-rays taken at about that time showed arthritis or degenerative disc disease in the cervical and lumbar spines. He was given steroids for a period of time, as well as Ultram, a pain reliever. Dr. McWeeney, who provided some of the treatment, diagnosed him at one point with cervical and lumbar radiculopathy and ordered an electromyelogram. That test showed a C7 radiculopathy.

As a result of these medical issues, Mr. Jones was given medical restrictions. In particular, on February 1, 2005, Dr. McWeeney gave him a six-month restriction to a sit-down job. That is shown both in a treatment note of that date (Exhibit P9, page 227) and on defendants' Exhibit D.

Mr. Jones' prison job prior to February 1, 2005, was to go to college. His medical restrictions did not interfere with his ability to do that job, and he apparently did quite well in school. However, for reasons not particularly relevant to this case, he was terminated from the college program early in 2005. Because all inmates must have a job assignment, Mr. Jones was

required to find something else to do.  His work background was
in power plant maintenance, so the unit secretary put his name in
for an opening in the institution's power house.  He reported to
that job on February 14, 2005, but when he produced his medical
restriction, he was told that there was no work for him there.

Shortly after that time, Mr. Jones was designated as a food
service worker.  Such workers report to CCI's dining hall and
assist in the preparation and service of food to the inmates and
officers.  Corrections Officer Limle was also assigned to the
food service area.  One of his responsibilities was to check in
inmates as they reported to work and to tell them what their job
assignment for that shift would be.  At all times relevant to
this case, Officer Limle worked an afternoon and evening shift,
from 2:00 p.m. to 10:00 p.m.

It was fairly typical for inmates with medical restrictions
to be assigned to the food services area.  At that time, all CCI
inmates with medical restrictions were required to carry a
written medical restriction form with them at all times.  When
they reported to work in the food services area, they were
required to tell Officer Limle or some other staff person, such
as a food service coordinator or manager, that they had such a
restriction.  If Officer Limle were told about a restriction, he
would note that restriction on a roster sheet that he maintained,
and he would also provide this information to the food service
supervisor.  The supervisor typically noted, on a computer
database containing the names of all inmates assigned to work in
the kitchen, that certain inmates were restricted to performing
only "sit-down" jobs, so that when job assignments were made,
these inmates would not be designated for more strenuous work.
According to Officer Limle, out of the approximately 500 inmates
who were assigned to work in the food services area at any one
time, as many as 150 might have had medical restrictions.

-3-

When Mr. Jones first reported to the food services in late February, 2005, he presented his medical restriction form. That restriction was noted in accordance with the above procedure, and Mr. Jones was not assigned to any kitchen job inconsistent with his restrictions.

## B. <u>The March 2, 2005 Incident</u>

The next event which has a bearing on this case happened on March 2, 2005, a day on which Mr. Jones was issued a conduct report and taken to segregation. Different witnesses to this event recount different versions of what took place.

The incident began when Mr. Jones went to dinner that day, not to work, but simply to eat the evening meal. Officer Limle testified, as he wrote in the conduct report, that he believed that he saw Mr. Jones "duck behind" the serving line – in other words, that he went to the side of the line where food was being served – and that another inmate handed him something. Because he was not assigned to the serving line, he was not permitted to be in that area. Suspecting that Mr. Jones had been given something – perhaps food – by someone on the serving line, Officer Limle pulled Mr. Jones aside and attempted to conduct a pat-down search. According to Officer Limle, whose version of these events was confirmed by Jerome Shoemaker, the food services manager present during that shift, Mr. Jones refused to be searched and cursed at Officer Limle.

Inmates are not permitted to refuse to be searched, nor are they permitted to show disrespect to staff. Therefore, Mr. Jones was taken to a supervisor, Lieutenant Hill, who placed him against a wall and searched him. No contraband of any type was found. However, Mr. Jones was charged with disobeying a direct order and disrespect and was taken to segregation. He was given a hearing on these charges on March 9, 2005, and found guilty of two rules violations. He was sentenced to fifteen days in

-4-

detention and lost his honor dormitory status.

Mr. Jones was released from segregation on March 17, 2005. While in segregation, he filed a written grievance against Officer Limle, the gist of which was that Officer Limle unfairly harassed and issued conduct reports to black inmates. A subsequent investigation of this grievance showed that 40 of 49 tickets written by Officer Limle (82%) over some period of time were issued to African-American inmates, and that only 45% of the inmates assigned to the kitchen were minorities of any type. (Exhibit P3). Officer Limle denied knowing at any time before March 28, 2005, that this grievance had been filed, but Mr. Jones believes that he would have known about it much sooner.

C. <u>The March 20, 2005 Incident</u>

Under CCI's procedures, an inmate's job assignment is reflected on a document called a "move sheet." Segregation is considered a job assignment. According to Mr. Shoemaker, when Mr. Jones was moved to segregation, his job designation was changed from food services to isolation. When that happened, his name was removed from the food services computer. After being released from segregation, Mr. Jones was reassigned to food services and his name was placed back in the computer. He reported for work on both March 18 and March 19, 2005, and, as before, his medical restrictions were honored. Further, according to Charlie Hawkins, who, like Mr. Shoemaker, was a food services supervisor, once Mr. Jones re-presented with a medical restriction, the computer list should have reflected that he could be assigned only to a job consistent with that restriction. Mr. Jones had been scheduled to work the breakfast shift on both March 18 and March 19, and it was Mr. Hawkins who viewed his medical restrictions on both days and released him from work.

Mr. Jones was not called out to work the morning on March 20, 2005, apparently because of a shift change involving the crew

to which he had been assigned.  However, after the four o'clock
p.m. count, he was told that Officer Limle had called over to his
block and asked that he and another inmate, James Harvey, come to
work for the dinner shift.  Mr. Jones and Mr. Harvey then
reported to the dining hall.  There appears to be no dispute that
Mr. Harvey presented a work restriction form and was excused from
working.  However, what happened to Mr. Jones that day is in
serious dispute, and resolving that dispute is the key to
deciding this case.

When Mr. Jones reported for work on the evening of March 20,
2005, he was checked in by Officer Limle.  According to Mr.
Jones, he displayed his medical restriction form at that time.
Rather than being excused from work, however, or even permitted
to see the food services supervisor, Officer Limle directed him
in no uncertain terms to report to the serving line, which was
the job assignment shown on Officer Limle's roster sheet.  Mr.
Jones complied with that order and began to serve chili.  Once he
had emptied the pan from which he was serving, he was told to get
a full pan of chili to replace it.  According to Mr. Shoemaker, a
full pan of chili weighs between thirty and forty pounds.  Almost
immediately upon lifting the pan out of a warming oven, Mr. Jones
experienced severe pain which caused him to drop the pan and fall
to the floor.  Once he hit the floor, Mr. Jones began kicking his
legs and screaming.  The testimony about what he screamed
differed somewhat.  Mr. Jones admitted screaming about his
medical restriction not having been honored, while others
testified that he said not only that Officer Limle and Mr.
Shoemaker had forced him to work despite his medical restriction,
but that he would sue them.

Only three other witnesses to these events were called to
testify.  One of them was Mr. Shoemaker.  However, he testified
that he did not see Mr. Jones that evening until after he had

fallen. He confirmed that Mr. Jones fell on the floor and was screaming and that he refused to allow any corrections employees to touch him. Eventually, the ambulance was called and he was taken to the hospital. He was kept overnight and returned to CCI the next day. More will be said later about Mr. Jones' medical condition and the significance of the March 20, 2005 injury.

Officer Limle also testified about the events of March 20, 2005. His testimony differs from Mr. Jones' in one very important respect. He stated unequivocally that Mr. Jones neither produced his medical restriction form when he arrived for work, nor stated that he had such a restriction. According to Officer Limle, had he been told by any inmate that the inmate had a medical restriction but did not have the document with him, the inmate would have been asked to return to his cell to retrieve it, or, if he had lost it, to go to the doctor to obtain a new one. Alternatively, if time did not permit either of those actions, Officer Limle would have called the dispensary to find out if the inmate had a medical restriction, or someone could have looked at the computerized list of food services inmates to see if the inmate had been restricted to sit-down work. Thus, according to Officer Limle, the only reason he directed Mr. Jones to work on the serving line on March 20, 2005, was that he did not recall that Mr. Jones had a medical restriction and Mr. Jones did not tell him that.

Renay Jones (whom the Court will refer to as Renay so as not to confuse him with the plaintiff), another CCI inmate, was the final witness to testify about this incident. His version of the key events differs from both Officer Limle's and Timothy Jones' version. According to Renay, although Mr. Jones did present his medical restriction form to Officer Limle, there was a further discussion about the form which involved Mr. Hawkins. It was Renay's impression that Mr. Hawkins made the final decision that

Mr. Jones had to work on the serving line.  As he put it, because Officer Limle was simply security, he had to carry out whatever directive was given by Mr. Hawkins.  Renay's testimony corroborated the rest of the events as others described them, including Mr. Jones' fall with a full chili pan and his reaction after the fall.

### D.  The Medical Evidence

Mr. Jones claims that much, if not all, of the treatment he has received for his neck and back problems since March 20, 2005 is causally related to the events of that date.  At the time of trial, he was scheduled for neck surgery on March 12, 2010.  Other surgeries may follow.  The Court will summarize the medical evidence, which consists primarily of the testimony of Drs. McWeeney and Ongkiko, Mr. Jones' prison medical file, and records of treatment that post-date his release from prison.

As explained earlier, Mr. Jones had both congenital and degenerative problems with his cervical spine before he went to prison.  There are scattered references to neck pain in his medical records from 2002 to 2004 (Exhibit P9).  He was diagnosed with cervical sprain after the dog incident of September 27, 2004.  His complaints of ongoing neck pain despite medication continued into 2005.  The problem was severe enough at that time for Dr. McWeeney to order various diagnostic studies, including x-rays and an EMG.  He did report increased pain after the kitchen incident, but his medication and treatment plan did not change significantly.  The emergency room notes from March 20, 2005, show that Mr. Jones arrived on a back board but had movement in all his extremities.  He was removed from the board approximately two hours after he arrived in the ER and was discharged shortly thereafter, by which time he was up and walking (although still reporting intense pain).  An MRI done a month later showed degenerative and arthritic changes to the

cervical spine as well as stenosis.

On September 22, 2005, when Mr. Jones first saw Dr. Miller, a neurosurgeon to whom he had been referred while still imprisoned, he reported that his neck and arm pain and numbness had not resolved since the dog incident. At least according to her letter of that date, he made no mention of the kitchen incident. Her letter of July 25, 2006, reported that epidural steroid injections had not improved his situation, and she suggested that after more current diagnostic studies were done, he might be a candidate for a posterior decompression. Another MRI was done on August 21, 2006, which, according to the MRI report itself, was not significantly different from the April 18, 2005 study, but which a later treatment note described as having shown some progression in his cervical stenosis. He did not receive any surgical procedures while incarcerated.

On April 9, 2009, plaintiff went to see Dr. Ongkiko. Mr. Jones told Dr. Ongkiko that his neck problems began in 1996 but that epidural blocks had eliminated his symptoms. He explained about the 2004 incident with the dog and the fact that it injured his neck. He also described the March 20, 2005 incident. According to Dr. Ongkiko, Mr. Jones said the pan of chili weighed more than 60 pounds and that lifting it caused him severe neck and back pain. He apparently attributed the later EMG and other treatment by Dr. Miller to that incident.

The examination done at that time showed marked tenderness and stiffness in his neck, with pain radiating down his right arm. His symptoms seemed to indicate a right-sided C6 nerve root irritation. X-rays also showed a cervical spondylosis and degenerative disc disease at C5 through C7. Dr. Ongkiko ordered an MRI and an EMG. These tests showed degenerative disc disease from C3 to C7 with some spurring and foraminal narrowing. The disc at C6-7 was protruding and there was congenital spinal

stenosis.   An MRI of the lumbar spine showed disease at the L3 to L5 levels.  Dr. Ongkiko eventually diagnosed congenital cervical spinal stenosis, progressive degenerative disc disease, and osteophyte formation pressing on the spinal cord.

Dr. Ongkiko was asked to express an opinion about whether the March 20, 2005 incident aggravated Mr. Jones' condition.  He stated that the twisting of the neck involved in that incident caused the return of symptoms which persisted for more than six weeks, thereby rendering it a chronic condition.  This opinion was expressly based on the assumption that in the months prior to that incident, Mr. Jones was not experiencing pain or taking medication for his neck condition. Dr. Ongkiko noted that Mr. Jones also complained of back pain after the incident, but he "did not go into it in detail."  He described the neck injury as a flexion extension injury, to which Mr. Jones was susceptible because of the extent of degeneration in the discs in the cervical spine.

Next, Dr. Ongkiko described the treatment he and others provided to Mr. Jones.  It included epidural blocks which had not been effective.  He presented Mr. Jones's case to other surgeons and they all agreed he needed surgery.  The surgery proposed is a fusion of the bones from C3 to C7.  Finally, he noted that Mr. Jones had been in constant pain since he had begun treating him.

On cross-examination, Dr. Ongkiko noted that Dr. Miller had also recommended the same surgery for Mr. Jones, posterior decompression, if other treatments were not successful. Typically, the hospital stay for this kind of surgery is two or three days.  It may or may not be followed by physical therapy. He described the surgery as elective to a point, but also with some degree of urgency given the length of the problem.  The alternative would be medication and a neck brace.

II.  Mr. Jones' Legal Claims

Although Mr. Jones claims only a single injury - the
aggravation of his medical condition which allegedly occurred on
March 20, 2005 when he attempted to lift the pan of chili, and
when he subsequently fell to the floor - he has set forth two
distinct legal claims against Officer Limle.  Those claims are:
(1) that Officer Limle forced him to work on the serving line on
March 20, 2005, knowing he had a medical restriction, as
retaliation for Mr. Jones' having filed a grievance against
Officer Limle accusing him of racial bias in his treatment of
inmates; and (2) that, even if Officer Limle was unaware of this
grievance, his disregard of Mr. Jones' serious medical condition
violated the Eighth Amendment's prohibition against cruel and
unusual punishment.  To a certain extent, these theories require
separate elements of proof, although in order to prevail on
either one, Mr. Jones had to prove by a preponderance of the
evidence that Officer Limle knew of his medical restrictions on
March 20, 2005.  The Court will begin its analysis of Mr. Jones'
legal claims by setting out the law governing each of these
claims.  For purposes of both claims, which arise under 42 U.S.C.
§1983, the Court finds (and it appears undisputed) that Officer
Limle was acting "under color of a[] statute, ordinance,
regulation, custom or usage, of a[] State" as that phrase appears
in §1983, and that Mr. Jones is a "citizen" or "person" entitled
to bring suit under that statute, so that the only legal question
in dispute is whether Officer Limle subjected Mr. Jones "to the
deprivation of ... rights, privileges, or immunities secured by
the Constitution" of the United States.  See id.

A.  The First Amendment Retaliation Claim

Retaliation for the exercise of constitutional rights is
itself a violation of the Constitution.  To state a retaliation
claim, a plaintiff must allege three elements: (1) that he or she

-11-

was engaged in protected conduct; (2) an adverse action was taken against him or her that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by the plaintiff's protected conduct.  Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999).  Retaliation claims must include a "chronology of events from which retaliation may plausibly be inferred."  Ishaaq v. Compton, 900 F.Supp. 935 (W.D. Tenn. 1995) (quoting Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)).  "An inmate has an undisputed First Amendment right to file grievances against prison officials on his own behalf."  Herron v. Harrison, 203 F.3d 410, 415 (6th Cir. 2000).  Therefore, retaliating against an inmate because the inmate filed a grievance is a constitutional violation if the act would deter a person of ordinary firmness from pursuing such grievances.

B.  The Eighth Amendment Claim

To establish an Eighth Amendment violation, a prisoner must show that he or she has a serious medical condition and that the defendant displayed a deliberate indifference to his or her health.  Estelle v. Gamble, 429 U.S. 97 (1976); Wilson v. Seiter, 501 U.S. 294 (1991).  This formulation has both a subjective and an objective component.  Objectively, the medical condition at issue must be "serious" as opposed to "trivial," "minor," or "insubstantial."  Subjectively, the defendant accused of violating the Eighth Amendment must have acted with a state of mind that can accurately described as "deliberate indifference."  Each of these components requires some elaboration.

It is not always easy to distinguish serious medical conditions from those that are not sufficiently substantial to implicate the Constitutional prohibition against cruel and unusual punishment, and the facts concerning the seriousness of

an inmate's condition are frequently in dispute.  In evaluating
such claims, courts have given weight to a variety of factors,
including whether the condition is one that a doctor or other
health care professional would find worthy of treatment, whether
it significantly affects everyday activities, and whether it
causes (or, if left untreated, has the potential to cause)
chronic and substantial pain.  See Chance v. Armstrong, 143 F.3d
688, 702-03 (2d Cir. 1998); see also Harrington v. Grayson, 811
F.Supp. 1221 (E.D. Mich. 1993)(focusing on the severity of the
condition, the potential for harm if treatment is delayed, and
whether such a delay actually caused additional harm).

     Under some circumstances, expert testimony may be needed to
establish the seriousness of a medical condition, particularly if
the inmate's claim is founded upon an unreasonable delay in
treatment.  See Napier v. Madison Co., Ky., 238 F.3d 739 (6th
Cir. 2001).  In other cases, however, when the condition does not
involve "minor maladies or non-obvious complaints of a serious
need for medical care," but rather "an obvious need for medical
care that laymen would readily discern as requiring prompt
medical attention by competent health care providers," expert
testimony is not essential to a finding that a serious medical
condition is present.  Blackmore v. Kalamazoo County, 390 F.3d
890, 898 (6th Cir. 2004).

     As to the subjective element, in Farmer v. Brennan, 511 U.S.
825, 839 (1994), the Supreme Court adopted "subjective
recklessness as used in the criminal law" as the appropriate
definition for deliberate indifference.  It held that "a prison
official cannot be held liable under the Eighth Amendment for
denying an inmate humane conditions of confinement unless the
official knows of and disregards an excessive risk to inmate
health or safety. . . ." Id. at 837.  Officials must be aware of
facts from which they could conclude that a substantial risk

exists and must actually draw that conclusion.  Id.  Prison
officials who know of a substantial risk to the health or safety
of an inmate are free from liability if "they responded
reasonably to the risk, even if the harm ultimately was not
averted."  Id. at 844.

     Because an Eighth Amendment medical claim must be
premised on deliberate indifference, mere negligence by a
prison doctor or prison official with respect to medical
diagnosis or treatment is not actionable under 42 U.S.C.
§1983.  "[A] complaint that a physician has been negligent in
diagnosing or treating a medical condition does not state a
valid claim of medical mistreatment under the Eighth
Amendment.  Medical malpractice does not become a
constitutional violation merely because the victim is a
prisoner."  Estelle v. Gamble, 429 U.S. 97, 106 (1976); see
also Brooks v. Celeste, 39 F.3d 125 (6th Cir. 1994).

III.   Discussion (Including Findings of Fact
       and Conclusions of Law).

A.   Liability

     Applying these principles to this case, in order to prevail
on his retaliation claim, Mr. Jones had to prove that he filed a
grievance, that Officer Limle knew about the grievance prior to
March 20, 2005, that he overrode Mr. Jones' medical restriction
that day because of the grievance, and that a person of ordinary
firmness would be dissuaded from filing grievances if he or she
knew that one of the consequences of doing so would be to be
assigned to a job that carried a risk of injury to the inmate.
In order to prevail on his Eighth Amendment claim, Mr. Jones had
to prove that he had a serious medical condition and that Officer
Limle both was aware of the condition and was deliberately
indifferent to the fact that ordering Mr. Jones to work on the
serving line carried with it a substantial risk that Mr. Jones

would be injured if he obeyed that order.  Because the evidence
is in conflict with respect to some elements of each of these
claims, the Court will now resolve the conflicts in the evidence,
and then determine if the facts as the Court finds them to be
satisfy the elements of either claim.

The Court turns first to the retaliation claim.  There is no
dispute in this case that Mr. Jones filed a grievance concerning
Officer Limle's treatment of African-American inmates.  For the
following reasons, the Court also concludes that forcing an
inmate to perform work that carries with it the potential for
serious injury is an act that would deter a person of reasonable
firmness from filing grievances.

In Thaddeus-X, the retaliatory actions deemed sufficient to
meet the standard set forth in that case included harassment,
physical threats, and a transfer to the area of the prison used
to house mentally disturbed inmates.  Id. at 398.  In Bell v.
Johnson, 308 F.3d 594 (6th Cir. 2002), which involved one of the
two plaintiffs who was also before the court in Thaddeus-X, the
court cited with approval a number of decisions which held that
actions such as confiscating an inmate's legal papers and other
property, denying him access to the law library, sending him to
segregation, conducting harassing searches of his cell, refusing
to provide him with hygiene items, and even confiscating his
tennis shoes, qualified as retaliation under the Thaddeus-X
standard.  See Bell v. Johnson, 308 F.3d at 604-05.  This Court
has held that threatening to remove an inmate's food allergy
accommodation is such an action.  Tate v. Bell, 2007 WL 1965592
(S.D. Oho July 3, 2007) (Sargus, J.).  Even issuing a misconduct
ticket to an inmate may constitute actionable retaliation.
Thomas v. Eby, 481 F.3d 434 (6th Cir. 2007).  Making an inmate
perform a job which could seriously injure him certainly falls
within this range of conduct.  Further, there is no need to show

-15-

that the inmate in question was actually deterred from filing future grievances or otherwise exercising his First Amendment rights in the future.  The Court of Appeals has repeatedly held that this factor addresses how an ordinary person would be affected by the type of action taken in retaliation, and not whether the plaintiff before the court was actually deterred from filing further grievances. See Thomas, 481 F.3d at 441; see also Harbin-Bey v. Rutter, 420 F.3d 571, 579 (6th Cir. 2005), citing Bell v. Johnson, 308 F.3d at 606.  Therefore, the only remaining disputed factual issues bearing on this claim are whether Officer Limle knew of the grievance before March 20, 2005, and whether he directed Mr. Jones to work in violation of his medical restriction on that day because of that grievance.

The Court concludes that Mr. Jones did not prove, by a preponderance of the evidence, that Officer Limle knew of the grievance on or before March 20, 2005.  In fact, the only evidence supporting Mr. Jones' position on this issue is his testimony that because prison officials were required to respond to informal grievances within seven days, and that seven-day period expired prior to March 20, 2005, someone must have talked to Officer Limle in that time frame.

On the other side of this issue, Officer Limle testified unequivocally that he did not learn of the grievance until he met with Kevin Scott, the institutional inspector, on March 28, 2005. He also testified that prison officials often responded to grievances about staff members without contacting the staff member first, because, among other reasons, the investigating official might not want to alert the staff member that his or her conduct was under investigation.  There is no documentation which even suggests that Officer Limle saw the grievance before March 20, 2005.  Although his testimony on this issue is self-serving, Mr. Jones presented no evidence to contradict it and did not

produce any documentary support for his claim.  Further, although the case law holds that an inference of retaliation can be drawn from the closeness in time between the inmate's exercise of a constitutional right and the alleged adverse action, as explained below, there were other, more significant reasons why Officer Limle might have wanted to punish Mr. Jones, and those reasons had nothing to do with Mr. Jones' exercise of his right to file a grievance.  The Court simply cannot conclude, on the basis of all of the evidence, that it is more likely than not that Officer Limle knew of this grievance before March 20, 2005.  The retaliation claim thus fails on this point.

Turning now to the Eighth Amendment claim, the Court first concludes that Mr. Jones had a serious medical condition.  His ongoing back and neck complaints, which were the subject of significant medical diagnosis, testing, and treatment, are certainly conditions that satisfy the "obvious" test adopted in this Circuit – that is, it would be obvious to a lay person that such conditions require medical care.  See, e.g., Blackmore v. Kalamazoo County, 390 F.3d 890 (6th Cir. 2004).  Here, the conditions were also under active treatment at the time, and Mr. Jones' cervical pain, in particular, was not limited to his neck but extended to his arm, hands and fingers.  Many courts have held that back conditions that cause ongoing pain and require ongoing treatment constitute serious medical needs for Eighth Amendment purposes.  See Morrison v. Mamis, 2008 WL 5451639, *8 (S.D.N.Y. 2008) (collecting cases); see also Allen v. Warden of Dauphin County Jail, 2008 WL 4452662 (M.D. Pa. September 29, 2008).  Although the seriousness of spinal conditions, including herniated discs and degenerative arthritis, is a determination made with reference to the facts of each individual case, see Avallone v. Hoffman, 2009 WL 2957955 (D. Vt. September 9, 2009), the Court has little difficulty concluding that, in this case,

Mr. Jones' neck and back conditions, taken together, constituted a serious medical need. The conditions were chronic, they caused ongoing pain, and they were the subject of ongoing medical treatment that included the ordering of significant diagnostic tests and a variety of treatments, including narcotic pain medication. Thus, the real question is whether Officer Limle took any action that can legitimately be characterized as deliberately indifferent to Mr. Jones' medical conditions. The answer to that question depends entirely upon what Mr. Limle knew about Mr. Jones' medical restriction on March 20, 2005.

Mr. Jones offered both direct and indirect proof that Officer Limle knew of the medical restrictions on March 20, 2005. The indirect proof relies on the undisputed fact that on more than one occasion in February, 2005, with the last time being February 27, 2005, Officer Limle checked Mr. Jones into the food service area and both reviewed and accommodated his medical restrictions. Mr. Jones suggests that Officer Limle would have remembered both the fact that Mr. Jones had a medical restriction and its duration (until August 1, 2005) when Mr. Jones reported to work on March 20. In light of the testimony about how many inmates report to work in the food services area on a daily basis, how many of them have medical restrictions, and how frequently the composition of the group of food services workers changes, the Court does not find this argument persuasive. Absent other circumstances (and there are other circumstances in this case), the Court concludes that it is not more likely than not that Officer Limle actually remembered on March 20, 2005 that Mr. Jones was limited to sit-down work.

The direct evidence presents much more of a problem, however. Both Mr. Jones and his inmate witness, Renay Jones, although their testimony differed in other respects, swore under oath that Mr. Jones showed his medical restriction form to

Officer Limle that day.  On the other hand, Officer Limle, despite claiming some memory problems, was absolutely adamant that this did not occur.  Given what happened shortly afterwards, this is not a situation where Officer Limle might simply have forgotten over time whether he saw the form or not.  The only conclusion the Court can reach is that one of the two parties to this case deliberately lied about what took place.  Each has a similar motivation to do so, because this fact is crucial to the outcome of the case, and each party has much at stake here. Renay Jones' testimony is only marginally helpful, both because he does have a relationship of sorts with the plaintiff - they have known each other since the ninth grade - and because he remembers details that no one else can corroborate.  Given how long ago this occurred, it is entirely possible that he is confused about whether the dispute over Mr. Jones' medical restriction - which, in his version of events, included some discussion with Mr. Hawkins, who may not even have been present at the dining hall during the evening meal - took place on March 20, 2005, or an earlier date.  The Court will therefore examine what factors might have caused either Mr. Jones or Officer Limle to act on March 20, 2005 in exactly the opposite way that they both behaved when in the identical situation only three weeks before, and what each may have been risking by behaving in that fashion.

This is where the events of March 2, 2005 take on real significance.  Although exactly what happened that day is disputed, even the differing versions of the events shed considerable light on what might have been going on in the parties' minds eighteen days later.

From Mr. Jones' standpoint, he was treated in a grossly unfair manner on March 2.  According to him, he was simply standing in the dinner line when Officer Limle came up behind

him, thrust his hands into Mr. Jones' pockets, and asked him (without any basis for doing so), "What you got?" As it turned out (at least by the time he was officially searched), he had nothing. Although Mr. Jones admits to having said, at one point, that if Officer Limle saw someone hand something to Mr. Jones, he needed a pair of glasses, and, at another point, smiling at Officer Limle when the search done by Lt. Hill did not produce any contraband, Mr. Jones did not believe he had been disrespectful or disobedient to the point of deserving a ticket. Consequently, getting sent to segregation, being convicted of two rules violations, losing his favorable housing status, losing his property (including a television set), and being transferred to a dormitory that he described as the "animal house," would all have been very upsetting to Mr. Jones. Further, he certainly believed he was targeted for this treatment by Officer Limle because he was African-American. In his formal grievance about the incident, he asked that Officer Limle be fired. Thus, he would have been motivated on March 20, 2005, which was the first time he encountered Officer Limle after March 2, 2005, to do something which would cause problems for Officer Limle.

On the other hand, Officer Limle cannot have been pleased with his encounter with Mr. Jones on March 2. If his version of the events is credited, he definitely saw Mr. Jones do something he should not. When he approached him to pat him down, something he testified that no inmate has the right to refuse, instead of cooperation, he got cursed. Mr. Shoemaker testified that Mr. Jones had an attitude during the entire encounter. Mr. Jones admitted to taking actions and making statements that further irritated Officer Limle. Officer Limle testified that the whole encounter, although it was brief, was out of the ordinary, and that Mr. Jones' actions were serious enough both to warrant the unusual event of his being placed against the wall by Lt. Hill

for a search and the issuance of a misconduct report. Although Officer Limle testified that when he saw Mr. Jones on March 20, 2005, he did not recognize him, he answered a request for admission in just the opposite way, and was very evasive in his testimony about this subject when cross-examined by Mr. Jones' counsel on the second day of the trial. The Court believes that Officer Limle did recognize Mr. Jones on March 20, 2005 - not because of their prior interactions about medical restrictions, but because of the encounter of March 2, 2005 - and that he perceived Mr. Jones as a troublemaker and as disrespectful. Thus, he also had a motive to make life difficult for Mr. Jones. The question is - which one of these gentlemen acted on his motive?

Certainly, each had much to lose by not acting appropriately on that day. If Mr. Jones really did fail to mention his medical restriction, and his plan was to feign an injury and then claim that he had showed that restriction to Officer Limle, he risked several adverse consequences. First, he might actually sustain a serious injury. Second, there might have been witnesses who could immediately disprove his version of events. For example, Mr. Jones has consistently said that another inmate, a Mr. Harvey, was with him at the time he showed his medical restriction to Officer Limle, and Renay Jones was also in the area. Either or both of them could have said that Mr. Jones never mentioned his medical restriction. Further, he would have been relying on the fact that Officer Limle would not remember that he had such a restriction if he did not bring it up, and that he would not run into any other staff in the dining hall who knew of his restrictions, even though he had been excused from work each of the last two days for exactly that reason. Attempting to work in violation of a medical restriction is also a prison rule violation, and Mr. Jones would have risked getting

sent right back to segregation.  For all of these reasons, it does not seem probable that Mr. Jones had concocted a scheme to get Officer Limle in trouble that depended on so many variables for its success and which posed a real threat of serious injury. Finally, because he did not know until after the four o'clock count on the day in question that he would even be called to work that day, and certainly did not know (or even have reason to suspect) that his job assignment would be on the serving line - he had been excused the previous two days for reasons that should have, but inexplicably did not, prevented food services from even making such a job assignment - he would have had to have developed the entire plan after finding out that he was assigned to the serving line.  That would mean that he initially withheld information from Officer Limle about his medical restriction until after he found out what his job assignment was.  However, he did not learn that information until he was actually speaking to Officer Limle outside the dining hall that evening.  This version of the events in question is fairly difficult to believe.

On the other hand, Officer Limle would also have taken some risks by refusing to acknowledge Mr. Jones' medical restrictions. Certainly, the risk that Mr. Jones might be injured was one of those, although he may not have believed that Mr. Jones had a medical condition so severe that working on the serving line was beyond his abilities.  Additionally, he ran the risk of receiving discipline if his actions were discovered.  The likelihood of this may have been tempered, however, by the thought that if Mr. Jones disputed his version of the events, it would be a case of a prisoner's word against that of a staff member, since no other staff members were present to see what happened.  Finally, he may have concluded from the fact that Mr. Jones had been given a serving line assignment that someone in food services had already cleared him for such work despite any medical restriction he

might have, and that Mr. Jones' protests to the contrary were more of the same attitude he had dealt with on March 2. Lastly, there is the unfortunate, but sometimes true, possibility that as a person with a position of superior power, he believed that he could act as he wanted, and not necessarily as the rules of the institution required, at least when it came down to matters of accommodating prisoners. Thus, it is somewhat easier to believe that Officer Limle instructed Mr. Jones, in strong language, simply to carry out his order to go to work on the serving line despite Mr. Jones' attempt to use his medical restrictions as a reason not to do so. On balance, this is the more likely version of the events in question.

It is fairly easy to conclude, from the facts the Court has found, that Officer Limle's actions violated Mr. Jones' constitutional rights. The Court has already determined that Mr. Jones had a serious medical condition. Further, it has determined that Officer Limle was aware at least that the condition was serious enough to warrant a medical restriction to a sit-down job. Given his assignment to the food services area, he must also have been aware that inmates working on the serving line not only had to remain standing during their shift, but also had to do some significant lifting. It is a matter of common knowledge that if someone's neck or back problems make it difficult for them to stand for any prolonged period of time, they are not good candidates to be lifting heavy objects, and that doing so can aggravate their condition. Here, applying the Farmer v. Brennan test, the Court finds that Officer Limle knew about Mr. Jones' medical restriction, knew that he was ordering him to perform work that was substantially likely to aggravate that condition, and deliberately disregarded that risk in order to punish Mr. Jones for his attitude and to demonstrate Officer Limle's authority. The Eighth Amendment does not permit such

conduct. Thus, Mr. Jones has proved this constitutional violation, and the only remaining question is the extent of the damage proximately caused by Officer Limle's unconstitutional behavior.

### B.  Damages

It is undisputed that Mr. Jones has, and has had for some time, a medical condition that requires treatment and which causes pain and limitations on his everyday activities.  This condition existed when he entered the prison system in 2002.  It was clearly aggravated by the fall in the dormitory in September, 2004.  A preponderance of the evidence shows that it was aggravated to some additional degree by the March 20, 2005 kitchen incident.  Officer Limle is legally responsible only for this final aggravation.  The Court will conduct its legal analysis of the damages issue under the following standards.

"[T]he basic purpose of a §1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights." Carey v. Piphus, 435 U.S. 247, 254 (1978).  Common-law tort damage principles are generally used when determining how to measure damages flowing from a constitutional deprivation.  Id. at 257; see also Memphis Comm. Sch. Dist. V. Stachura, 477 U.S. 299, 305 (1986).  Under the common law, an injured party may recover for, among other things, economic injuries such as medical expenses, and may also recover for pain and suffering and loss of enjoyment of life.  See, e.g. Whitfield v. Melendez-Rivera, 431 F.3d 1 (1st Cir. 2005) (discussing award of pain and suffering damages to injured §1983 plaintiff); Knapps v. City of Oakland, 647 F.Supp. 2d 1129, 1169 (N.D. Cal. 2009) (discussing award of medical expenses to injured section 1983 plaintiff).

Of course, in a case such as this, where the plaintiff's claim is that a pre-existing condition was aggravated by the

-24-

defendant's acts, the Court may award only those damages caused by the aggravation, and not damages for the pre-existing condition itself or its impact upon the plaintiff. <u>See Shannon v. Lester</u>, 519 F.2d 76 (6th Cir. 1975). Federal courts typically instruct juries that

> you should compensate plaintiff for any aggravation of an existing disease or physical defect or activation of a latent condition, resulting from such injury. If you find that there was such an aggravation, you should determine, if you can, what portion of plaintiff's condition resulted from the aggravation and make allowance in your verdict only for the aggravation. However, if you cannot make that determination, or if it cannot be said that plaintiff's condition would have existed apart from the injury, you should consider and make allowances in your verdict for the entire condition.

<u>See Harris v. City of Circleville</u>, 2010 WL 816974, *7 (S.D. Ohio March 5, 2010), <u>quoting</u> 3 Fed. Jury Prac. & Instr. § 128.03 (5th ed.). The Court will endeavor to follow this instruction in assessing how much of the medical expenses and pain and suffering caused by Mr. Jones' neck condition can properly be attributed to the aggravation of that condition which occurred on March 20, 2005.

Here, it is difficult to determine the extent to which the March 20, 2005 fall actually aggravated Mr. Jones' pre-existing degenerative arthritis of the cervical spine or his spinal stenosis. Not only were those conditions present before March 20, 2005 (and they are chronic conditions that are not caused by a single trauma), but they were symptomatic from September 27, 2004 onward. Not only were they symptomatic, but the planned course of treatment was to perform certain diagnostic tests such as an EMG and an MRI and to refer Mr. Jones for a neurological consult if necessary. Some of this had already occurred, and other parts of this course of treatment had been scheduled, prior

to March 20, 2005.  It does not appear that the course of treatment was changed or accelerated in any way as result of that incident, or that the treatment rendered to Mr. Jones - which consisted primarily of medication - changed after that date, except for the time that his medication was discontinued because he was accused of hoarding it.  Additionally, the prison medical records do not show that he was given any additional restrictions on his activities because of the kitchen incident.  Finally, Dr. McWeeney testified that his diagnostic plan did not change in response to that incident, although he did treat Mr. Jones with medication for the injury he suffered on March 20, 2005.  He noted that the hospital described the diagnosis on that date as "exacerbation of neck pain."  Certainly, Dr. McWeeney did not provide any opinion to the effect that, but for this incident, Mr. Jones' course of diagnosis and treatment would have been different.

Dr. Ongkiko was offered as the plaintiff's expert on this medical causation question.  He testified at pages 17 and 18 of his deposition that the kitchen incident did aggravate Mr. Jones' existing condition.  However, the injury he described, a flexion and extension injury, is almost exactly the same injury he attributed to the dog incident.  Ongkiko Deposition, at 10.  He also stated that the incident caused Mr. Jones' condition to become chronic, which would support an inference that all of the treatment received by Mr. Jones after that date and the medical expenses he incurred after that date were caused by that incident.  The Court, however, cannot draw that inference.

The problem with Dr. Ongkiko's testimony is the premise upon which it rests.  The hypothetical question posed to him asked him to assume that Mr. Jones was pain-free in the several months prior to the kitchen incident and that he had no mobility issues in the months prior to it.  That premise is contradicted by the

record.  The record shows that the only time that Mr. Jones was
essentially symptom-free was prior to the dog incident in
September, 2004.  It appears more likely than not, from this
record, that it was that fall, which included Mr. Jones' striking
his head on a metal locker, that re-aggravated his congenital and
degenerative cervical spine disease and caused him to become
symptomatic.  The best that can be said about the kitchen
incident is that it caused a short-term, acute exacerbation of
his condition, but it did not alter his long-term prognosis,
diagnosis, or treatment.  In other words, the Court is unable to
find that Mr. Jones proved, by sufficiently reliable medical or
other evidence, that the only reason, or even a substantial
reason, that he sought treatment from Dr. Ongkiko after his
release from prison, and is now a candidate for surgery, is that
he was injured on March 20, 2005.  Rather, the Court finds that
he would be facing the same treatment for his underlying
condition even if the kitchen incident never occurred.  There is
simply no indication that any of the treatment modalities which
were used in response to the September 27, 2004 dog incident
would not have been used at all, or would not have been used as
soon, had he not fallen in the kitchen on March 20, 2005.  That
being so, there is no reasonable basis on this record for
allocating any of his economic loss - which consists entirely of
medical expenses - to the events of March 20, 2005.  Thus,
although Mr. Jones is entitled to compensatory damages for the
injury he suffered on that date, those damages must be reasonably
related to the acute injury and exacerbation which occurred then,
and not to any more chronic effects of his cervical spine
disease.

It is clear that Mr. Jones suffered severe, and perhaps
excruciating pain, for several hours after the incident.  Less
than eight hours after it occurred, however, he had been

discharged from emergency room treatment and walked out of the
emergency room, although with assistance. He appears to have
returned to his normal prison life relatively quickly thereafter.
The medical testimony supports the notion that an acute condition
is one which subsides in a matter of weeks. It is more likely
than not that for several weeks after the March 20, 2005
incident, Mr. Jones experienced more pain and limitations than he
did before, but he likely returned to his baseline levels no
later than a month after the incident. Thus, he should be
compensated for experiencing a brief time of severe additional
pain, and a somewhat longer time of gradually-decreasing
additional pain. The question then becomes how to translate this
type of injury into monetary terms.

Other decisions from the prison context help to shed light
on this question. For example, in Hendrickson v. Cooper, 589
F.3d 887, 893 (7th Cir. 2009), the court described a $75,000
damages award for an aggravation of a pre-existing neck and back
condition caused by a prison guard's actions in throwing an
inmate to a cement floor and pressing his knees into the inmate's
back as "not a monstrously excessive estimate of the pain" that
the plaintiff experienced from his "ordeal." That would appear
to set the high end of the spectrum for this type of injury.
Moving toward the other end of the spectrum, in Jackson v.
Austin, 241 F.Supp. 2d 1313 (D. Kan. 2003), the plaintiff was
awarded $15,000 for injuries caused by an assault by prison
guards which aggravated his pre-existing knee condition, resulted
in a short period of severe pain, and required treatment with ice
and anti-inflammatories for a period of one month; and in Tate v.
Troutman, __ F.Supp. 2d __, 2010 WL 374953 (E.D. Wisc. January
27, 2010) the plaintiff was awarded $27,000 for inadequate
medical care for a separated shoulder, which caused him to
experience unnecessary pain for a month until the shoulder was

properly stabilized.  The award also included an amount for emotional distress, however, something about which there is little evidence in this case.  Finally, in <u>Hynes v. LaBoy</u>, 887 F.Supp. 618 (S.D.N.Y. 1995), the court upheld a jury award of $1,250 in compensatory damages to the victim of an assault by a prison emergency response team which caused the plaintiff to suffer some cuts, two black eyes, a short loss of consciousness, and to spend five days in the prison infirmary.  In so doing, it surveyed a number of other cases where injured inmates were awarded compensatory damages, and observed, in language equally applicable here, that the cases dealing with these types of claims "represent a broad range of awards."  <u>Hynes</u>, 887 F.Supp. at 626.

If this were a jury case, the Court would be comfortable in upholding any jury verdict within the general range of the cases cited above as neither too high nor too low.  That illustrates that there is no figure which is "just right" for this type of case, but simply a range of figures that can be considered reasonable, and a variety of approaches which can be used to reach a reasonable figure.

The traumatic event of March 20, 2005, is the single incident for which Mr. Jones deserves the greatest compensation. The combination of being forced to do a job where he could be injured, under circumstances where he thought he was being treated unfairly, and actually suffering what must have been a painful injury, coupled with the time he spent not knowing how serious the injury was and whether he would recover from it, is an injury that can reasonably be compensated for by an award of $7,500.  The after-effects of the injury, including the additional pain he experienced after being returned to the prison, and additional limitations in his activities due to pain, can reasonably be said to be worth, on average, $250 per day for

thirty days.  Adding these two figures together produces a total damage award of $15,000, which the Court believes is fair and reasonable under all of the circumstances.  Because there is no proof of economic loss directly related to these injuries, that will be the total damage award in this case.

IV.  <u>Order</u>

Based on the Court's findings of fact and conclusions of law, the Court finds for Mr. Jones on his Eighth Amendment claim and Officer Limle on the retaliation claim.  On the former claim, Mr. Jones is awarded compensatory damages in the amount of $15,000.  The latter claim is dismissed with prejudice.  The Clerk is directed to enter a judgment incorporating the terms of this order.


<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge